IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**MICHAEL A. ROMERO and**
**BONNIE L. SCOTT,**

       **Plaintiffs,**

vs.                                                                                     No. CIV 11-0255 RB/LFG

**SALVADOR SAMBRANO,**
**in his individual capacity, BOARD OF COUNTY**
**COMMISSIONERS OF GUADALUPE COUNTY,**
**JONATHAN BERNAL, in his individual capacity,**
**THE CITY OF SANTA ROSA, and CHARLES**
**BACA, in his individual capacity,**

       **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants Board of County Commissioners of Guadalupe County and Jonathan Bernal's Motion for Qualified Immunity, or Alternatively, Motion for Summary Judgment as to Plaintiff Romero (Doc. 75) and Defendant Salvador Sambrano's Motion for Summary Judgment on Plaintiff Romero's Claims (Doc. 77). Jurisdiction arises under 28 U.S.C. §§ 1331 and 1367. Having considered the submissions of counsel, the record, and relevant law, the Court grants these Motions as to Romero's claims for unlawful arrest, false imprisonment, malicious prosecution, and conspiracy, and denies these Motions as to Romero's claims for excessive force and battery.

**I.**    **Background**

On October 23, 2010, Plaintiffs, who are husband and wife, argued at their residence near Santa Rosa, New Mexico, and a guest dialed 911. Defendant Jonathan Bernal, a former Guadalupe County Sheriff's Deputy, and Defendant Salvador Sambrano, a New Mexico State

Police Officer, arrested Plaintiffs at a nearby party and brought criminal charges against them. Plaintiffs filed suit in this Court asserting claims under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act. Plaintiff Romero alleges claims for unlawful arrest, battery, false imprisonment, excessive force, malicious prosecution, and conspiracy. Defendants move for summary judgment and assert qualified immunity. Romero opposes the motions.

## II.   Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In cases where the moving party will not bear the burden of persuasion at trial, it bears the initial responsibility of identifying an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "If the movant meets this initial burden, the burden then shifts to the nonmovant to 'set forth specific facts' from which a rational trier of fact could find for the nonmovant." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (quoting FED. R. CIV. P. 56(e) (2007 version)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009).

## III.   Statement of Facts

The Court must view the facts in the light most favorable to Romero, the non-moving party. *See id.* Thus, all reasonable inferences are drawn and factual ambiguities are resolved in

his favor. On Saturday, October 23, 2010, a birthday party for Plaintiff Michael Romero's son was held at the home of Romero's father and stepmother ("parents' house"), located about 100 yards from Plaintiffs' residence. (Doc. 89-2, Scott Dep. at 37-38, 60). Scott left the party after Romero's stepmother, Edwina Romero, insulted Scott. (*Id*. at 37). Scott went to her nearby home where her thirteen-year-old son, Tyler Scott, and Tyler's thirteen-year-old friend, Mike Garcia, were playing video games in Tyler's bedroom. (*Id*. at 31, 32). Romero went to Plaintiffs' residence and asked Scott to return to the party, but she refused. (*Id*. at 46). Plaintiffs argued for four or five minutes, but they did not engage in a physical altercation. (*Id*. at 45, 48). Scott's yelling scared Tyler and Mike. (*Id*. at 47). Mike called 911 on his cell phone. (*Id*. at 46-47). Romero went back to the party. (*Id*. at 46). After Romero left, Ms. Scott began to cry. (*Id*. at 45-46).

Deputy Bernal was in his police unit when he heard the dispatch for a domestic disturbance with a possible stabbing at Plaintiffs' residence. (Doc. 74-1, Bernal Dep. at 17-18). Deputy Bernal, Officer Sambrano and City of Santa Rosa Police Officer Charles Baca[1] responded to the call. (*Id.* at 29; Doc. 79-1, Sambrano Dep. at 27). En route to the Plaintiffs' home, the dispatcher informed the officers that a caller stated that there had not been a stabbing. (Doc. 79-5, Sambrano Recording at 2:40-3:02). Scott tried to cancel the 911 call, but the officers proceeded to Plaintiffs' residence, as state policy imposes a duty on responding law enforcement officers to ensure that people involved in domestic disputes are safe. (Doc. 89-3, Sambrano Dep. at 77).

---

[1] Plaintiffs accepted an offer of judgment in the amount of $5,001.00 from the City of Santa Rosa and stipulated to dismissal of the claims against Officer Charles Baca. (Docs. 69 and 101).

3

When Deputy Bernal and Officer Salvador Sambrano arrived at Plaintiffs' residence, the officers encountered Tyler Scott and Mike Garcia out front. (Sambrano Recording at 5:27). Mike informed Officer Sambrano that Romero had pushed Scott and Romero was in a house down the road. (*Id.* at 5:30). Scott came out of the house and the officers observed she was limping and she had been crying. (Scott Dep. at 46-47, 54; Sambrano Recording at 5:37 ). Officer Sambrano testified in his deposition that Tyler and Mike were talking fast as if they were excited. (Sambrano Dep. at 75-76).

On the recording from Officer Sambrano, Scott told the boys to get in the house. (Sambrano Recording at 6:06-6:16). Officer Sambrano said if something was wrong the officers were going to figure it out. (*Id.* at 6:15). Scott told the officers that "[they] could figure it out all [they] wanted," she worked for the judiciary, and domestic violence was not a law enforcement matter if there was an "unwilling victim." (*Id.* at 6:30-6:37). Officer Sambrano told Scott that she could "be unwilling all she wanted" and the officers were going to talk with the "gentleman," meaning Romero. (*Id.* at 6:39).

During her deposition, Scott explained that she stopped Tyler and Mike from speaking with the officers as she felt the officers should speak to her. (Scott Dep at 53). In response to Officer Sambrano's inquiry as to what was going on, Scott responded there had been a misunderstanding. (*Id*. at 55). Officer Sambrano asked about the reported stabbing. (*Id*.) Scott responded that "nobody was stabbed." (*Id*.) Officer Sambrano asked Mike and Tyler where Romero had gone. (*Id*. at 59). The boys pointed to Romero's parents' house, where the party was underway. (*Id*. at 60). Deputy Bernal and Officer Sambrano proceeded to Romero's parents' house and Scott went back inside her residence with Tyler and Mike. (Scott Dep. at 61).

4

Officer Sambrano knocked on the door to the parents' house and Daniel Romero, Plaintiff Romero's brother, invited the officers inside. (Sambrano Recording at 8:05-8:10; Doc. 77-6, Daniel Romero Dep. at 15). The officers found Romero sitting at the kitchen table talking on a cell phone. (Sambrano Recording at 8). After he hung up, Romero told the officers "bye guys. You're out of here." (*Id.*) Officer Sambrano asked what was going on, and Romero responded that nothing was going on and the officers were "free to go." (*Id.*) Romero told the officers that Scott had hit him. (*Id.*) A male voice in the background stated that Scott was drunk and wanted to take the truck. (*Id.*) Romero told the officers that he took Scott a plate of food, and she started "slapping the hell out of me." (*Id.*)

Romero said that Officer Sambrano was being "real aggressive." (Sambrano Recording at 9:21-9:43). Officer Sambrano asked Romero for his identification and Romero responded that he did not have it. (*Id.* at 9:50-10:02). Officer Sambrano told Romero to step outside several times and Romero repeatedly refused. (*Id.* at 10:05-10:42). Officer Sambrano wanted to separate Romero from other potential witnesses to the domestic violence incident. (Doc. 77-1, Sambrano Dep. at 24-25). Officer Sambrano typically asks the parties involved in a domestic incident to step out of the home, closer to his police unit, so that his audio continues to function properly and any injuries can be documented on video. (Sambrano Dep. at 27).

Romero did not want to go outside because he did not want to be recorded on video as he was concerned about his reputation as a former magistrate and police officer. (Doc. 75-2, Romero Dep. at 121-122). Romero noticed that Officer Sambrano's belt recorder was on and he had two stripes on his uniform, which indicated he had two years of experience. (Doc. 86-5, Romero Dep. at 110-111). Romero told Officer Sambrano that he was being aggressive, he was a

5

rookie, and Romero wanted to talk to Officer Sambrano's supervisor. (*Id*. at 111-112).

Officer Sambrano grabbed Romero's left wrist and Deputy Bernal grabbed his right wrist and forearm. (Romero Dep at 119; Sambrano Dep. at 30; Doc. 77-4, Bernal Dep. at 62-63). The chair rolled backwards and Romero was unable to gain his balance. (Romero Dep. at 120-121). The officers tried to knock Romero down with their feet. (Romero Dep. at 125). As the officers pulled him to the door, they shoved his head into a freezer handle and cut his forehead. (Romero Dep. at 126). Romero struggled with the officers to avoid being taken down and the officers and Romero fell to the ground near the door. (Romero Dep. at 125; Sambrano Dep. at 68-69; Bernal Dep. at 68-69, 71-72). Romero was knocked out and found himself on the ground with blood on his face. (Romero Dep. at 126). At his deposition, Romero testified that he was sprawled in the doorway with his head and part of his chest outside. (Romero Dep. at 128). Romero felt pain in his back and his chest as one officer was on his neck and the other was on his back holding him down with their knees. (Romero Dep. at 127). The officers handcuffed Romero. (Sambrano Dep. at 93-94, 39-41).

Romero's father, stepmother, brother, and sister-in-law, vocally protested the treatment of Romero. (*Id.*) Scott returned to the parents' house and saw Romero lying halfway out the door with Deputy Bernal and Officer Baca holding him down. (Scott Dep. at 61). The party-goers were screaming, "Stop. You are hurting him. He can't breathe." (*Id.* at 62-63). Because Romero was wiggling, Scott went over to tell him to quit moving. (*Id.* at 63). Scott saw that Romero could not breathe and that was why he was fighting back and trying to get up. (*Id*.) Romero's chest was on a step and the officers were smashing his face on the old broken cement of the patio. (*Id.* at 63-64). Romero was handcuffed, but he struggled to get up. (*Id.* at 64). Romero's head

was bleeding. (*Id.*) Romero protested he could not breathe. (Romero Dep. at 129). One of the officers started to take out a stun gun, but stopped when Romero's sister-in-law informed the officers that Romero has heart problems. (Romero Dep. at 127). Officer Sambrano stomped on Romero's back. (Scott Dep. at 65-66).

Romero's father, Pime Romero, complained of chest pains. (Sambrano Dep. at 35-36). Officer Sambrano called for an ambulance. (*Id.* at 35). Romero's daughter, Amy Romero, arrived and asked the officers to sit Romero up. (Romero Dep. at 137). The officers sat Romero in a chair on the patio and Amy Romero comforted him. (Romero Dep. at 138). Romero asked Officer Sambrano, "You did all this because I called you a rookie? Is that why you did this to me?" (*Id.*) Officer Sambrano grabbed him and said, "Let's go." (*Id.*)

As they escorted Romero to a police unit, one of the officers twisted the handcuffs, inflicting pain to Romero's left wrist. (Romero Dep. at 138-139). Romero protested, the pain increased, Romero turned his body, an officer grabbed Romero's neck, and Romero fell to the ground. (Romero Dep. at 140). The video camera in a police unit recorded the incident, but it is difficult to ascertain exactly who did what to whom. (Doc. 77-5). Officer Sambrano stated on his audio recording that Romero kicked him in the groin, and Officer Baca and Deputy Bernal testified in their depositions that Romero kicked them. (Doc. 77-4, Bernal Dep. at 99; Doc. 77-7, Baca Dep. at 80-84). Romero testified in his deposition that he did not kick the officers. (Romero Dep. 220, 232).

Romero was arrested and charged with three counts of battery against a peace officer and one count of resisting, evading or obstructing a peace officer, in violation of N.M. STAT. ANN. § 30-22-24 and § 30-22-1. (Doc. 77-8). Subsequently, the District Attorney filed an Amended

7

Criminal Complaint against Romero, adding a count for battery against a household member, in violation of N.M. STAT. ANN. § 30-3-15. (Sambrano Dep. at 139-140).

Romero was transported to the Guadalupe County Hospital where he received x-rays and a splint for his wrist. (Romero Dep. at 151-153, 236). After he received a medical clearance, Romero was booked into jail. (*Id.*) On October 25, 2010, Romero's employer, Akal Security, placed him on administrative leave without pay. (*Id*. at 162, 170). Romero had back and chest pain for a few days and his wrist hurt for a month after the incident. (*Id.* at 151-153, 236). He still has headaches every other day as a result of the incident. (*Id*. at 159-161). Romero obtained psychological counseling a few months after the incident, but no additional medical treatment for his physical injuries. (*Id.* at 236-240). The criminal charges were dismissed in September 2011. (*Id.* at 171).

**IV.    Discussion**

Defendants contend that they are entitled to qualified immunity and summary judgment on Romero's claims. Section 1983 provides that "[e]very person" who acts under color of state law to deprive another of constitutional rights "shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable officer would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In contrast to a standard motion for summary judgment, which places the burden on the moving party to point out the lack of any genuine issue of material fact for trial, a motion based on a claim of qualified immunity imposes the burden on the plaintiff to show "both that a constitutional

violation occurred and that the constitutional right was clearly established at the time of the alleged violation." *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009) (internal quotations omitted). If either of these requirements is not met, the defendant is entitled to qualified immunity and summary judgment is appropriate.

"When a warrantless arrest is the subject of a § 1983 action, the arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to make the arrest." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007). Probable cause exists if "facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Id.* (quotation omitted). Because the standard for probable cause is objective, "[t]he subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). "Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested." *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012) (internal citations omitted). Whether a reasonable officer would believe that there was probable cause to arrest in a given situation is based on the totality of the circumstances. *Valenzuela*, 365 F.3d at 897.

"Battery against a household member consists of the unlawful, intentional touching or application of force to the person of a household member, when done in a rude, insolent or angry

manner." N.M. STAT. ANN.§ 30-3-15(A). "[H]ousehold member" is defined broadly as including "a person with whom a person has had a continuing personal relationship" - or in other words, "a dating or intimate relationship." *State v. Gutierrez*, 286 P.3d 608, 610 (N.M. Ct. App. 2012) (quoting N.M. STAT. ANN. § 30-3-11). Officer Sambrano and Deputy Bernal were dispatched in response to a 911 report of domestic violence. When Deputy Bernal and Officer Salvador Sambrano arrived at Plaintiffs' residence, Mike Garcia informed Officer Sambrano that Romero had pushed Scott and Romero was in a house down the road. Scott came out of the house and the officers observed she was limping and she had been crying. Scott referred to herself as an "unwilling victim" of domestic violence. When they arrived at the house where Mike Garcia directed them, the party was ongoing. Officer Sambrano and Deputy Bernal knocked on the door and Daniel Romero invited them inside. Romero was uncooperative and claimed that Scott had hit him. Romero informed the officers that Scott was his wife. Based on the totality of the circumstances, Officer Sambrano and Deputy Bernal had probable cause to arrest Romero for battery against a household member at this point in time. Defendants are entitled to summary judgment on Romero's unlawful arrest claim.

Romero's claims for false imprisonment, malicious prosecution, and conspiracy presuppose that the officers did not have probable cause to arrest Romero. *See Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir. 1985); *Dickson v. City of Clovis*, 242 P.3d 398, 404 (N.M. Ct. App. 2010). In that the officers had probable cause to arrest Romero for battery against a household member, the facts of record do not support his claims for wrongful arrest, false imprisonment, malicious prosecution or conspiracy. As a result, summary judgment will be granted in favor of Defendants on these claims.

Romero alleges both unlawful arrest and excessive force arising from a single encounter. The Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it. If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

*Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) (en banc). Thus, the fact that the arrest was lawful does not necessarily foreclose the excessive force claim, which is governed by the Fourth Amendment's "objective reasonableness" standard. *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010). Under this standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The ultimate issue is whether the officers' use of force was objectively reasonable in light of the surrounding facts and circumstances as seen from the perspective of a reasonable officer at the scene. *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005) (citing *Graham*, 490 U.S. at 388). In determining whether the use of force is reasonable in a particular situation, courts consider (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396.

The Tenth Circuit has stated that when an officer's violation of the Fourth Amendment is

11

particularly clear from *Graham* itself, it does not require a second decision with greater specificity to clearly establish the law. *See Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). Notably, force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest. *Id*. at 1285. Romero was not suspected of a serious crime, he was unarmed and he posed no immediate threat to the officers. The facts are in dispute as to whether he actively resisted arrest. Thus, Romero's right to be free from excessive force in this type of situation was clearly established at the time of the incident.

Romero has presented evidence that Officer Sambrano and Deputy Bernal tried to knock him to the ground, shoved his head into a freezer handle, knocked him out, held him down with their knees on his neck and back, smashed his face into the cement, stomped on him, twisted his handcuffs to inflict pain, grabbed his neck, and held him down on the ground after he was handcuffed. Romero was unarmed, he did not attempt to flee, and he did not physically threaten the officers. The New Mexico Family Violence Protection Act is inapplicable because Scott did not request the officers' assistance. *See* N.M. STAT. ANN.§ 40-13-7(A). Viewed in the light most favorable to Romero, the record establishes that the actions of Officer Sambrano and Deputy Bernal were not objectively reasonable and the force applied may well have been excessive. In that material facts remain in dispute, Defendants have not satisfied their summary judgment burden as to the state-law excessive force and battery claims.

**THEREFORE,**

**IT IS ORDERED** that Defendants Board of County Commissioners of Guadalupe County and Jonathan Bernal's Motion for Qualified Immunity, or Alternatively, Motion for Summary Judgment as to Plaintiff Romero (Doc. 75) and Defendant Salvador Sambrano's

Motion for Summary Judgment on Plaintiff Romero's Claims (Doc. 77) are GRANTED as to Romero's claims for unlawful arrest, false imprisonment, malicious prosecution, and conspiracy, but DENIED as to Romero's claims for excessive force and battery.

_____
**ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE**